UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DENNIS MISCHLER,** | * | **CIVIL ACTION** |
| **PETITIONER** | * | |
| | * | **CASE NO.   23-cv-0990** |
| **VERSUS** | * | |
| | * | |
| **TIM HOOPER, WARDEN,** | * | **SECTION "I" (5)** |
| **RESPONDENT** | * | |
| | * | |
| | * | |

**RESPONSE TO PETITION FOR *HABEAS CORPUS* RELIEF**

Dennis Mischler is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. He is serving what amounts to a fifty-five year sentence for two counts oral sexual battery, one count molestation of a juvenile, and fifty-four counts pornography involving juveniles.

Mischler has petitioned this Court for a writ of habeas corpus.

Mischler's petition is timely, and his claims are exhausted. But his claims lack merit. The Court should therefore dismiss the petition with prejudice and otherwise deny relief.

## TABLE OF CONTENTS

PRELIMINARY MATTERS.................................................................................3

PROCEDURAL HISTORY..............................................................................4

TIMELINESS..................................................................................................6

EXHAUSTION & PROCEDURAL DEFAULT................................................6

MERITS REVIEW..........................................................................................6

    1.    The sufficiency of the evidence claim (Claim 2).......................................7

    2.    The ineffective assistance of counsel claim (Claim 1)...........................19

CONCLUSION AND PRAYER......................................................................26

CERTIFICATE OF SERVICE.......................................................................27

## PRELIMINARY MATTERS

**1.    Custody.**

The respondent does not dispute that the petitioner is in custody.

**2.    The state court record.**

The respondent has filed, along with this *Response*, the complete state court record which is described in the separately filed *Notice of Lodging of State Court Record Materials* (Rec. Doc. 10).

**3.    The facts of the case.**

The defendant is a former New Orleans scout leader and teacher who sexually abused a young family member and possessed a large amount of child pornography at his northshore home. *See generally State v. Mischler*, 18-1352 (La. App. 1 Cir. 5/31/19), 2019 WL 2334219, at *1-7 (court of appeal's summary of the trial testimony). A more detailed statement of the facts will be provided as necessary during the discussion of the petitioner's claims.

**4.    The petitioner's claims.**

Mischler raises two claims. The first is ineffective assistance of counsel; the second concerns the sufficiency of the evidence. *See* Rec. Doc. 3-1, pp. 9-27, 27-36. The respondent addresses the sufficiency-of-the-evidence claim before addressing the ineffective assistance of counsel claim for the sake of orderly analysis.

<u>PROCEDURAL HISTORY</u>

**1.      Proceedings in the state courts.**

**A.      Proceedings leading to conviction and sentence.**

The district attorney, on September 24, 2014, charged petitioner Dennis Mischler with two counts oral sexual battery (Counts 1-2), one count molestation of a juvenile (Count 3), and fifty-four counts pornography involving juveniles under the age of thirteen years (Counts 4-57).[1]

The trial was held from December 11-15, 2017, and resulted in verdicts of guilty as charged for the hands-on offenses (Counts 1-3), guilty as charged for some of the child pornography offenses (Counts 4-32), and for the remaining child pornography offense, guilty of the lesser offense of pornography involving juveniles under the age of seventeen years (Counts 33-57).[2] The state district court sentenced the defendant to serve fifteen years as to Counts 1 and 2, forty years as to Count 3, and fifteen years for each of Counts 4-57. The court then ordered that Counts 1-3 run concurrently with one another, and that Counts 4-57 run concurrently with one another, but that Counts 1-3 and Counts 4-57 run consecutively.[3] This results in what amounts to a fifty-five year sentence: the fifteen years concurrent sentences for Counts 4-57 run consecutive to the forty-year sentence imposed on Count 3.

---

1   State Court Record, Volume 1 (Rec. Doc. 10-1), pp. 69-74.

2   Rec. Doc. 10-1, pp. 24-60 (minute entries) & *id.* at 190-209 (verdict forms).

3   Rec. Doc. 10-1, pp. 61-62.

### B.      Direct review proceedings.

The First Circuit Court of Appeal affirmed the defendant's convictions and sentences on May 31, 2019. *State v. Mischler*, 18-1352 (La. App. 1 Cir. 5/31/19), 2019 WL 2334219.[4] Mischler then filed both counseled and *pro se* writ applications to the Louisiana Supreme Court. Both writ applications were denied on February 26, 2020. *State v. Mischler*, 19-1100 (La. 2/26/20), 347 So.3d 875; *State v. Mischler*, 19-1248 (La. 2/26/20), 347 So.3d 880.[5]

Mischler did not seek certiorari review from the United States Supreme Court.[6]

### C.      Collateral review proceedings.

Mischler applied for post-conviction relief on February 11, 2021.[7] The trial court denied relief on April 4, 2022.[8] Mischler timely applied for supervisory review from both the First Circuit Court of Appeal and the Louisiana Supreme Court. His applications were denied on August 2, 2022, and March 7, 2023, respectively. *State v. Mischler*, 22-0521 (La. App. 1 Cir. 8/02/22), 2022 WL 3071555, *writ denied*, 22-1361 (La. 3/07/23), 356 So.3d 1009.[9]

### 2.      Proceedings in this Court.

The instant habeas corpus petition is dated March 16, 2023.[10]

---

4   Rec. Doc. 10-10, pp. 94-123.

5   Rec. Docs. 10-8 & 10-9.

6   Rec. Doc. 3, pg. 3 (Answer to Question 9h).

7   Rec. Doc. 10-10, pp. 19, 6-8, 20-93.

8   Rec. Doc. 10-10, pp. 124-131.

9   Rec. Docs. 10-11 & 10-12.

10  Rec. Doc. 3, pg. 15; Rec. Doc. 3-1, pg. 40.

TIMELINESS

The petitioner's application is timely for the reasons explained in his "Statement of the Case." Rec. Doc. 3-1, pp. 3-4.

EXHAUSTION & PROCEDURAL DEFAULT

The petitioner's claims are exhausted and not in procedural default.

MERITS REVIEW

Mischler's claims were adjudicated on the merits. Specifically, for Claim 1, the Louisiana Supreme Court held:

> Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*State v. Mischler*, 22-1361 (La. 3/07/23), 356 So.3d 1009, 1009.

For Claim 2, the Louisiana First Circuit Court of Appeal held that, for Counts 1-3, "the jury had sufficient evidence to find the essential elements of the charges beyond a reasonable doubt," and for the remaining counts, "the jury was not unreasonable in rejecting defendant's claims that someone else put the child pornography in his bedroom or in finding him guilty of every count of possession of child pornography beyond a reasonable doubt." *State v. Mischler*, 18-1352 (La. App. 1 Cir. 5/31/19), 2019 WL 2334219, at *11-12.

Because Mischler's claims were adjudicated on the merits, his habeas corpus petition "shall not be granted … unless the adjudication of the claim—

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence
presented in the State court proceeding."

28 U.S.C. § 2254(d).

The Court is familiar with AEDPA's standards governing merits review. The respondent therefore need not and does not expound upon those standards.

**1.     The petitioner's sufficiency of the evidence claim (Claim 2).**

**A.     The details of the petitioner's claim.**

In the first paragraph under the petitioner's Claim 2, he asserts that he "was convicted on less than sufficient evidence to prove each element of the crimes charged." Rec. Doc. 3-1, pg. 28.

**B.     Overview of the applicable law.**

The clearly established federal law governing sufficiency of the evidence claims comes from *Jackson v. Virginia*, 443 U.S. 307 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id*. at 319 (emphasis in original). "Review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury." *United States v. Young*, 107 Fed. Appx. 442, 443 (5th Cir. 2004).

**C.     The state courts' adjudication of the petitioner's claim.**

The last reasoned state court decision concerning the sufficiency of the evidence is the decision of the Louisiana First Circuit Court of Appeal on appeal.

### *i.*

That Court summarized the facts as follows:

> Following complaints to the National Center for Missing and
> Exploited Children, in October 2010 the United States Postal
> Inspector and Toronto Police Service conducted an investigation
> into a Canadian movie studio alternately called the "Toronto
> Company" and "Azov Films." The investigation revealed the
> company was producing and distributing child pornography. A
> search warrant was executed and the company's business
> records were recovered, including customer names and shipping
> addresses. Defendant's name, physical address, and email
> address were found in company records showing multiple
> purchases of child erotica and child pornography billed and
> shipped to defendant. A postal inspector then conducted a
> forensic investigation to confirm defendant was the person
> actually accessing the company's website. Ultimately, the
> inspector's investigation also determined that defendant's email
> address was used to set up an account on a website known for
> child pornography exchange. Further investigation revealed
> defendant had been implicated in at least two formal allegations
> of child sex offenses, and he was also a known "educational
> worker." Having developed this information, a local postal
> inspector, with the assistance of the St. Tammany Parish Sheriff's
> Office, obtained a search warrant for defendant's residence.
>
> On May 29, 2014, upon execution of the search warrant, law
> enforcement officers recovered from defendant's bedroom a large
> amount of physical and electronic child erotica and child
> pornography that exclusively featured juvenile boys, in addition to
> items matching those listed as sold to defendant by the
> "Toronto Company." Specifically, there were about 5,000 images
> and 26 videos found on two thumb drives located in a nightstand
> next to defendant's bed. Some of the files had been accessed as
> recently as three to fifteen days before the search was
> conducted. Files had been created on the thumb drives over the
> course of five-and-a-half years. The creation dates, however,
> pertained to when the files were created on the thumb drives,
> not when the original image or video had been generated.
> Periods of relative inactivity on the thumb drive roughly
> corresponded with defendant's claimed medical issues that put
> him in repeated hospital care. The State also introduced
> testimony for demonstrative purposes, and over defendant's

objection, about two videos that defendant was shown as ordering from Azov, but which were not physically found in his residence during the search.

Defendant, who was home at the time of the search, and after having voluntarily signed a waiver of his *Miranda* rights, explained the child pornography was not his, that he had "been hacked on," and that he had caught "William" "seeing things on that computer before[.]" Defendant claimed "William" had put the photos on the thumb drives. After ascertaining "William" was W.G., defendant's nephew and victim, investigators interviewed him and obtained names of other possible victims, including J.S. and A.E. Subsequent police interviews with witnesses revealed victims M.M., G.W., and A.P. Further, following media coverage of the story, two more victims, S.L. and J.B., came forward. R.L., the final victim to testify, was involved in the only prior allegation against defendant to go to trial.

J.S., 25 years old at the time of trial, testified that defendant is his great-uncle. J.S. described how he would frequently go to defendant's house in New Orleans when he was about 11 years old and continued to do so later in St. Tammany Parish. J.S. testified in detail that while at defendant's house in New Orleans, defendant, unbidden, got into a shower with him and began to soap J.S.'s genitals with his bare hands. J.S. explained that after Hurricane Katrina, while defendant was living in St. Tammany Parish in a FEMA trailer, defendant would give him and other boys gifts and take them to the movies "[a]ny time [they] wanted to." During one visit to defendant's trailer, J.S. testified that defendant "performed oral pleasure on a sensitive area" while J.S.'s friend was out at the store and only stopped upon the friend's return. During his testimony at trial, however, J.S. said he did not "know the specifics" of that event.

J.S. described a later incident, still within a year of Katrina, where defendant took him to a hotel and again performed oral sex on him. On that occasion, defendant also attempted to anally penetrate J.S., but stopped when J.S. told him to stop. Defendant characterized his behavior to J.S. as being "a way of expressing love." According to J.S., defendant had a desktop computer that J.S., his friends, and defendant's family could use at his house, but that defendant had a password-protected laptop that no one else was ever allowed to use. J.S. conceded he had done some prison time for felony possession with intent to

distribute marijuana and also admitted that he had only recently been released from prison. J.S. also had stolen money from defendant "a couple of times." Moreover, J.S. testified that he told no one of the abuse until the prosecutor approached him to talk about it in 2014. J.S. also was aware that defendant's house had been burglarized in the month before defendant was arrested. The State presented prison records indicating that, among other periods, J.S. was incarcerated between December 20, 2013 and July 14, 2014.

Defendant stated that up until the allegations for which he was then being tried, he had a "wonderful" relationship with J.S. Defendant denied ever touching J.S. in the shower in New Orleans, contended that J.S. was never alone with him in his St. Tammany FEMA trailer and said that he never took J.S. alone to a hotel off US Hwy. 190. He acknowledged that J.S. had stolen from him.

S.L. related his experience as a Boy Scout with defendant, then a scout leader, nearly 40 years prior. At a scouting event, S.L., who was then 14 years old, was housed in a tent with defendant, who was 28 years old at the time. One evening, after defendant had pushed the bunks in the tent closer together, defendant took S.L.'s hand and placed it on defendant's penis three different times. S.L. first attempted to tell a 15 or 16-year-old about the incident, but was told by him "[d]on't say anything[,]" and "[y]ou'll get us all in trouble." The next day, S.L. was able to tell his father, a DEA agent. After no action was taken by the camp directors, S.L. and his father notified the local Sheriffs Department. Although defendant was initially arrested at the camp, the District Attorney eventually chose to not prosecute the case. Thirty years later, S.L. saw a news story about the allegations against defendant and chose to come forward with his own story.

Defendant testified at trial and reaffirmed he had been "found innocent of all of those charges." Defendant contended that S.L. had been previously caught with another staff member in bed, who was fired on the spot. He denied knowing S.L. would be in defendant's tent, and claimed that S.L. was mad at him because the staff member had been fired.

A.E., also a relative of defendant's, testified about an occasion when he was six or seven years old and spent the night with defendant at his home in New Orleans. A.E. was taking a bath,

and defendant entered the bathroom asking if A.E. needed help. Defendant then used his bare hands to touch A.E.'s genitals under the pretense of washing him. A.E. also recalled that he would sit on defendant's lap, and defendant would place his hand on A.E.'s crotch. Defendant denied ever groping A.E. in the shower and stated that A.E. was infrequently at his house.

A.P., another family member of both J.S. and defendant, testified about time spent at defendant's home in New Orleans, which he confirmed was "a gathering point" for the family. A.P. explained that defendant purchased him clothes, shoes, and toys because his family was financially troubled. A.P. reported that he noticed defendant would be "pacing back and forth" in front of the bathroom while he showered. When A.P. was 10 or 11 years old, defendant would "rub the backside or the front side of his hand would rub up against the crack of [A.P.'s] butt." A.P. also said defendant would give him and his underage male family members alcohol to drink. During at least one of those nights, when A.P. was around 12 or 13 years old, defendant performed oral sex on A.P. and had A.P. engage in anal sex with him. Following one incident, defendant asked A.P. if he had enjoyed the night before, and defendant said to him, "You're either gay or you're not. There's no in between" and that defendant "was very happy about it."

Defendant said he caught A.P., J.S., and W.G. smoking marijuana in his house, and he reprimanded them. He denied ever giving A.P. alcohol or engaging in sex acts with him.

W.G., J.S.'s half-brother, was 27 years old at the time of his testimony at defendant's trial. W.G. described defendant as the "patriarch" of the family and stated that his home in New Orleans was the "family home," where holidays and summer vacations would be spent. During one such trip, when W.G. was nine years old, he and defendant were scrolling through photos on defendant's password-protected computer when a photo of a naked boy briefly popped up. The next evening, after W.G. found the photos again on the computer, defendant woke up, and began fondling and performing oral sex on W.G. W.G. said over his lifetime, defendant had engaged in sexual activities such as oral sex, masturbation, and anal sex with him more than ten times. In another evening of drinking with defendant, A.P. and W.G. engaged in sex acts with each other, with defendant eventually joining them. W.G. testified that he witnessed defendant

engaging in oral and anal sex with A.P. The sexual activities with defendant stopped when W.G. was about 16 years old, but he was aware that some occurred in St. Tammany Parish.

W.G. stated that he had never made any purchases on defendant's computer or with defendant's credit card and that defendant's computer was "locked down tight." W.G. also stated that he remembered seeing several thumb drives near defendant's computer and that defendant had once told him if defendant died, W.G. was to destroy them. W.G. acknowledged and described his five misdemeanor convictions for the jury. According to W.G., defendant would purchase alcohol and cigarettes for him and other young male acquaintances, if asked. The State presented jail records indicating W.G. was incarcerated or under close State supervision from April 30, 2012 until April 1, 2015. Among other periods within that span, W.G. was in jail from May 16, 2014 to June 12, 2014.

Defendant described a more tumultuous relationship, where W.G. said he hated defendant because of a financial transaction gone wrong between defendant and his sister, W.G.'s mother. He claimed W.G. had stolen from him. He denied any kind of sexual relationship with W.G. and contested the dates W.G. lived at his house. Defendant claimed he never allowed alcohol in his house due to his brother being killed by a drunk driver. Defendant explained his computer was not password-protected until after a break-in in 2014, shortly before the search warrant was carried out on his house. Defendant's house was open to "a lot of people who [he] didn't know[.]"

G.W., who was about 25 years old at the time of trial, testified about the time period when he lived in Arkansas and his family hosted evacuees from Louisiana following Hurricane Katrina. Then 12 years old, G.W. shared his bedroom with defendant during defendant's time in Arkansas. G.W. remembered defendant bringing a laptop with him on which they, and sometimes others, would watch movies together. Defendant would sit uncomfortably close to G.W., sometimes placing a hand on G.W.'s leg. On one occasion, defendant placed his hand on G.W.'s genitals on the outside of G.W.'s shorts. A couple of days after the defendant and his family left G.W.'s home, G.W. told his mother, who then helped him report the incident to police. However, the case ultimately was never prosecuted.

Defendant suggested that he bought clothing for G.W.'s family. Defendant said G.W. stayed in another house while he was in Arkansas, that G.W. and his friends watched movies without him, and that he was never alone with G.W. Defendant said the case was dismissed because he "wasn't there." However, defendant later admitted he was "assigned to sleep" in G.W.'s room.

R.L., who was 42 years old at the time of trial, testified regarding his interactions with defendant in fifth grade, when defendant taught math at a public school in New Orleans. One day, while helping then 12-year-old R.L. alone at his desk, defendant began to rub R.L.'s inner leg and moved his hand to R.L.'s testicles. R.L. told his parents, and although the case went to a bench trial, defendant was found not guilty. R.L. related that he had two prior misdemeanor convictions for DUI and purse snatching.

Defendant alleged that R.L. was actually being molested by his father and claimed that he attempted to intervene to help R.L. The result of that attempted intervention, defendant posited, was the unfounded accusation against himself. Defendant testified that with the way the classroom was set up, he could not have touched R.L. without everyone else in the classroom seeing, implying they were never alone.

J.B., who was 59 years old at trial, testified regarding his experience with defendant while in Boy Scouts. Defendant was an assistant Scoutmaster in J.B.'s troop. J.B. recounted one evening where the defendant, then 21 years old, slept between J.B., who was 13 years old, and another scout in a tent. While in the tent, defendant reached down into J.B.'s pants and began to grab and manipulate J.B.'s penis with his hand. On another occasion, during an overnight visit by defendant to J.B.'s home when he was 14 years old, J.B. woke up to defendant performing oral sex on him. J.B. was prompted to come forward after hearing a report of defendant's arrest on the instant charges.

Defendant claimed that a storm happened on the night of the alleged incident and that the storm kept him awake all night. He denied ever sleeping in a tent with "any child" or sleeping at J.B.'s home.

M.M.,[7] who was 50 years old at trial, is defendant's nephew and godchild. M.M. described defendant as the patriarch of the

family, who would at times provide financial assistance to other family members. M.M. testified that when he was about three years old, defendant took him into a room at a family home and put his penis through M.M.'s thighs from behind, but that there was no penetration. Later, after M.M. began living with defendant, defendant and defendant's brother would perform oral or anal sex on M.M. "two times a week or more," totaling "over a hundred times," until M.M. moved out at the age of 13. M.M. recounted how defendant made him swallow his ejaculate on each occasion of oral sex and how painful the anal sex was every time. Defendant told M.M. that if he told anyone, no one would believe him and that he would end up going to a boys home and would never see his mother again. M.M. testified he told no one until he disclosed the past events to his first wife, after he was having issues with alcohol and anger. Several years later, when meeting with defendant in a New Orleans restaurant, defendant confessed to both M.M. and his first wife that he had perpetrated the abuse, and that it was his "way of showing love" and "the only way he understood to show love." Defendant soon thereafter gave M.M. money to pay for therapy. M.M. admitted to three misdemeanor convictions.

Defendant admitted that he saw M.M. frequently as a child. Defendant claimed he did not hear of M.M.'s allegations until 2015, in a recording made subsequent to M.M. coming forward. He acknowledged that M.M. had once borrowed $1,500.00 from him and that M.M.'s ex-wife had once asked him for $400.00. He admitted going to the restaurant with M.M. and his ex-wife, but denied ever talking to her about M.M.

Additionally during his testimony, defendant explained his medical issues, dating back to 2003, some of which continued to the day of trial. Defendant claimed to have been in the hospital for periods of time through 2008-2012.

Defendant described how on the day the search warrant was executed, five police officers entered his house and began to search through everything. Defendant said his Miranda rights were not explained to him. Defendant denied ever implicating W.G. during the execution of the search warrant. Defendant claimed he had been "hacked" at the time the materials were ordered from the Toronto Company using his credit cards and email address and were sent to his home in New Orleans. He also claimed W.G. had been to his house at that same time to "help

[him] pack and help [him] move." Defendant acknowledged that the Azov movies police found, which he claimed he did not order, were somehow transported from his old address to his new address and that the mailing address Azov had for the account created with his email address was changed when he moved.

Defendant claimed that he kept "stick drives" around his house so his students could copy things with them, and that he would find them scattered all over his house. Defendant claimed the stick drives were by his bed as a result of being temporarily put there after having originally been in the study, but were moved when his house was burglarized in May 2014. He stated that due to illness, he put things where he could reach them easily. Defendant admitted that after the robbery and until four weeks before the search warrant was executed, the only way to have used his laptop was to use it on the nightstand next to his bed. Defendant alleged that his laptops had been stolen in a robbery, and claimed that the one found by his bed was purchased to replace them.

Defendant denied ever hearing of Azov films and claimed anyone had access to his laptop, that he shared the passwords to his email accounts with his family members, and that his postal mailbox was accessible to anyone. He acknowledged that his main email account, the one used to purchase items from Azov, was nearly exclusively accessed from the IP address associated with his home. Although defendant claimed he complained to the credit card company about hundreds of dollars of fraudulent charges, he denied knowing that charges to Azov films constituted some of those, and stated that the first time he became aware of those purchases was during the search of his house.

Explaining that he slept alone in his bed the night of the last recorded access of the thumb drive containing child pornography, he claimed that someone else "must have" accessed it at 4:30 in the morning, the "last accessed" time stamp on some of the files. Photographs introduced into evidence show a thumb drive on the nightstand on May 3, 2014, just after defendant's house had been robbed, and again on May 29, 2014, the day of the search warrant execution. Defendant argued that the photos showed two different thumb drives. Time stamps on some files on the drive seized by police indicate they were created during the early morning hours of May 23, 2014 and again accessed on May 26, 2014, while defendant was purportedly sleeping in the bed next to his computer. Defendant

initially speculated he could have been in the hospital overnight when that occurred, but later admitted he had not been.

Dr. Scott Benton, accepted by stipulation as an expert in child abuse pediatrics, testified out-of-order, with the consent of defense counsel. Dr. Benton discussed delayed disclosure by children of sexual abuse. Additionally, Dr. Benton went through each of the photos supporting a count against defendant and gave an opinion as to whether the child subject was under the age of 17 and, if so, whether the child was also under the age of 13. He was unable to make a conclusive determination of the child being under 13 for all of the photographs, and he conceded that he had not interviewed any of the victims in the photographs or in the instant case.

Defendant's sister, Darlene Smith, testified. She said she had never seen or heard of inappropriate contact between defendant and children. She reported that W.G. had access to a computer in defendant's St. Tammany house and that "to her knowledge," there was no password on it. According to her, both J.S. and W.G. had stolen from defendant and would be around to help when defendant was ill. Darlene reported that defendant had replaced the two stolen laptops with a new one after the robbery and that he purchased clothes and shoes for any of the family's children when asked.

Amber Giordano, defendant's great-niece, also testified on his behalf. She stated she never saw any sexually inappropriate behavior involving defendant or inappropriate behavior involving anyone else in the family. She admitted to forging a check written on defendant's account with W.G. She said that while defendant initially did not have a password on his laptop, he eventually put one on, but told the family what it was so that anyone could use it. She also acknowledged she was responsible for the robbery of defendant's house in May 2014.

*State v. Mischler*, 18-1352 (La. App. 1 Cir. 5/31/19), 2019 WL 2334219, at *1-7.

*ii.*

The First Circuit Court of Appeal then addressed the sufficiency of the

evidence as follows:

> In his second assignment of error, defendant contends he was
> convicted with insufficient evidence. Regarding the charges
> involving J.S., defendant asserts that J.S. could not remember
> any details of the events and that the jury only convicted him on
> the weight of evidence presented under LSA-C.E. art. 412.2.
> Regarding the possession of child pornography charges,
> defendant primarily argues that the State did not prove beyond
> a reasonable doubt that his house was not burglarized and the
> incriminating evidence was left by someone else. Defendant also
> makes assertions without citations to the record that there were
> "discrepancies in dates of when pornographic media was added
> to the thumb drives and when appellant was ill" thereby making
> it impossible for him to do so. The State argues the evidence
> submitted to the jury was sufficient to support the convictions.
>
> A conviction based on insufficient evidence cannot stand, as it
> violates Due Process. See U.S. Const. amend. XIV; La. Const.
> art. I, § 2. The standard of review for the sufficiency of the
> evidence to uphold a conviction is whether, viewing the evidence
> in the light most favorable to the prosecution, any rational trier
> of fact could have found the essential elements of the crime
> beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
> 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2D 560 (1979). . .
>
> * * *
>
> Defendant does not contest that the actions alleged constituted
> the offenses, only that the evidence was insufficient to establish
> that he perpetrated them. However, regarding the offenses
> against J.S., given the great discretion afforded to the factfinder,
> defendant merely highlights the fact that J.S. said he could not
> remember the detailed specifics of each event. As the trier of
> fact, the jury was free to accept or reject J.S.'s incomplete
> recollection of events. Moreover, the jury was aware of his
> criminal history, and the jury evidently believed J.S.'s version of
> events over defendant's assertions that nothing occurred and
> that he was wholly unaware of J.S.'s claims until he was
> arrested on May 29, 2014. Moreover, given the consistency of
> J.S.'s allegations with defendant's prior acts with other boys of

similar age as detailed in the previous assignment of error, when viewed in a light most favorable to the prosecution, the jury had sufficient evidence to find the essential elements of the charges beyond a reasonable doubt. Thus, the jury had sufficient evidence to return convictions on all three counts.

Similarly, in addition to defendant's internally inconsistent or incredulous testimony and the consistent testimony from witnesses that defendant's computer was password-protected and others were not allowed to use it, the State presented forensic evidence that showed either that defendant possessed the child pornography or that someone had used his laptop while he slept next to it. Although he claimed at trial and again on appeal, that he was in the hospital at the time the photographs were downloaded, it was within the province of the jury to accept or reject his testimony. Similarly, although defendant argued below, and presented testimony from his sister and niece to confirm his claim that his computer and email accounts were always open and available to anyone who entered his house, whether he knew them or not, the jury apparently and reasonably found this explanation implausible. Given the weight of the evidence against defendant, the jury was not unreasonable in rejecting defendant's claims that someone else put the child pornography in his bedroom or in finding him guilty of every count of possession of child pornography beyond a reasonable doubt.

*State v. Mischler*, 18-1352 (La. App. 1 Cir. 5/31/19), 2019 WL 2334219, at *10-12.

### D.   Mischler is not entitled to *habeas* relief on this claim.

It is self-evidence that the state court correctly applied *Jackson v. Virginia* in concluding that the defendant's convictions are supported by sufficient evidence. The state court decision denying relief was not "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Mischler is therefore not entitled to habeas relief.

18 of 27

### 2. The ineffective assistance of counsel claim (Claim 1).

### A. The details of the petitioner's claim.

Mischler's first claim is one of ineffective assistance of counsel. Rec. Doc. 3-1, pp. 9-27. This claim is outlined by the petitioner by the of bold headings which read: "counsel failed to investigate evidence that someone else download[ed] or otherwise obtained the pornography" (Rec. Doc. 3-1, pg. 11), "counsel failed to investigate and find witnesses who could have presented evidence on behalf of the defense" (*id.*, pg. 14), "counsel failed to investigate and find evidence to contradict state witnesses at trial" (*id.*, pg. 19), and "counsel developed no meaningful relationship with Mischler and was therefore not able to establish sufficient trust to learn information critical to the defense" (*id.*, pg. 21).

The defendant's specific complaints are:

a. Counsel failed to "investigate matters that are readily available public records such as the Orleans Parish Board of Education investigation, the Courts actions in Mississippi, or the District Attorney's records showing the reasons he dismissed the charges." Rec. Doc. 3-1, pg. 14.

b. Counsel failed to present to the jury "[a]mple evidence of others having access to [the petitioner's] computer." Rec. Doc. 3-1, pg. 15.

c. "There were discrepancies in dates of when pornographic media was added to the thumb drives and when the appellant was ill or in the hospital. Evidence of the time and duration of Mischler's hospital stays, the dates that others were living in his home and had access to his computer, should have been compared to the dates and times the items were purchased online." Rec. Doc. 3-1, pp. 15-16.

d. Counsel "failed to investigate the computers history, cookies, or cashe files to see if there were hidden files within the computer." Rec. Doc. 3-1, pg. 16.

e. Counsel failed to call "Chris Bellone or any of the other fifteen staffers

to rebut the testimony of S.L." and "failed to call Donald Batiste to rebut the testimony of R.L." Rec. Doc. 3-1, pp. 18-19.

f.      Counsel failed to call Scott Williams, Robert Williams Jr., Edward Smith, and/or Diana Pervel. Rec. Doc. 3-1, pp. 20-22.

g.      Counsel "failed to investigate or even interview Jay McKinnon." Rec. Doc. 3-1, pp. 23-24.

h.      Finally, counsel "developed no meaningful relationship with" the petitioner and "[s]he was always 'too busy' to meet with him to discuss possible avenues of defense." Rec. Doc. 3-1, pg. 25. He says that he "notified her of several witnesses that could have been called, records that could have been obtained, and even provided [his] personal records, all that would support [his] defense." Id. He does not, however, identify any specific evidence beyond what has already been mentioned above.

## B.    Overview of the applicable law.

The clearly established federal law governing this claim comes from *Strickland v. Washington*, 466 U.S. 668 (1984). Subsequent jurisprudence applies this general standard to specific contexts.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Adekeye v. Davis*, 938 F.3d 678, 683 & n. 21 (5th Cir. 2019). This requires "concrete evidence that counsel should have uncovered but did not." *Id*. at 684.

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *King v. Davis*, 883 F.3d 577, 590-591 (5th Cir. 2018) (citation omitted).

Finally, the Sixth Amendment does not guarantee "a meaningful relationship" between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

### C.   The state courts' adjudication of the petitioner's claim.

The Louisiana Supreme Court, in denying relief, found that Mischler "fail[ed] to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984)."

### D.   Mischler is not entitled to *habeas* relief on this claim.

This decision is neither contrary to clearly established federal law nor an unreasonable application of clearly established federal law, for the reasons that follow.

> *a.   Counsel failed to "investigate matters that are readily available public records such as the Orleans Parish Board of Education investigation, the Courts actions in Mississippi, or the District Attorney's records showing the reasons he dismissed the charges." Rec. Doc. 3-1, pg. 14.*

The defendant did not, in connection with his application for post-conviction relief, provide any information whatsoever concerning an "Orleans Parish Board of Education investigation."[11] The information he does provide concerning "the Courts actions in Mississippi" reflects that the pertinent court records are unavailable, having been destroyed in Hurricane Katrina.[12] He does not provide any district attorney records.[13]

The state district court, in evaluating this claim, noted: "the record shows that evidence was adduced and trial counsel argued the fact that previous investigations

---

11 See Rec. Doc. 10-10, pp. 48-93 (all attachments to PCR application).

12 Rec. Doc. 10-10, pg. 90.

13 See Rec. Doc. 10-10, pp. 48-93.

against Mischler were dismissed, or resulted in charges being dropped or found insufficient."[14] This is supported by the record.[15]

      b.    *Counsel failed to present to the jury "[a]mple evidence of others having access to [the petitioner's] computer." Rec. Doc. 3-1, pg. 15.*

The state district court, in evaluating this claim, stated: "the trial transcript shows that there was abundant testimony that others had access to Mischler's computer, which is referenced by Mischler himself in his application.... Trial counsel included this information in closing argument, arguing that anyone could have had access to Mischler's computer and that many people were in and out of his house."[16]

      c.    *"There were discrepancies in dates of when pornographic media was added to the thumb drives and when the appellant was ill or in the hospital. Evidence of the time and duration of Mischler's hospital stays, the dates that others were living in his home and had access to his computer, should have been compared to the dates and times the items were purchased online." Rec. Doc. 3-1, pp. 15-16.*

The state district court, in evaluating this claim, stated: "trial counsel elicited testimony about Mischler's hospital stays and argued in closing that his illness would have prevented him from committing the acts alleged against him, or downloading the pornography."[17] This is supported by the trial transcript.[18]

14 Rec. Doc. 10-10, pg. 127, citing Rec. Doc. 10-5, pg. 167 (excerpt from closing arguments).

15 *See* Rec. Doc. 10-3, pp. 182-187 (testimony of S.L. that Mischler was arrested in Mississippi, and that charges were dismissed following a preliminary examination); *then see* Rec. Doc. 10-4, pp. 715-716 (testimony  of G.W. that he reported being touched by the defendant in Arkansas, and that his parents contacted police, but to his knowledge nothing happened) *and* Rec. Doc. 10-5, pg. 1037 (testimony of the petitioner's sister that the Arkansas "charges" relating to G.W. "were dropped"); *see also* Rec. Doc. 10-4, pp. 37-38 (testimony of R.L. that Mischler was prosecuted in Orleans Parish for conduct involving R.L. and that the defendant was acquitted).

16 Rec. Doc. 10-10, pg. 127; *see* Rec. Doc. 10-5, pg. 162, lines 5-9 (closing argument).

17 Rec. Doc. 10-10, pg. 127.

18 See Rec. Doc. 10-4, pp. 131-137 (testimony about illnesses); id. at pp. 230-234 & Rec. Doc. 10-5, pp. 2-5, 57 (more testimony about illnesses); see also Rec. Doc. 10-5, pg. 164, lines 2-8 &id. pg. 168, lines 18-22 (closing argument).

The petitioner does not otherwise specify "the time and duration of Mischler's hospital stays" or "the dates and times [that] items were purchased online" much less show that any overlap exists between the two.

>    d.    Counsel "failed to investigate the computers history, cookies, or cashe files to see if there were hidden files within the computer." Rec. Doc. 3-1, pg. 16.

The state district court, addressing this claim, reasoned: "trial counsel argued that testimony adduced at trial showed there was no indication of files containing child pornography on Mischler's computer."[19] This is supported by the transcript of counsel's closing argument:

> When they did the evaluation of his computer, there was nothing found on the computer. Yes, it was a preview, but you know they're looking. They would have taken that computer, surely, if there was any indication that there was any child porn on there.[20]

The trial court's conclusion naturally follows from this observation: "Mischler's assertion that further investigation needed to be performed, in order to further prove that nothing existed, is meritless."[21]

>    e.    Counsel failed to call "Chris Bellone or any of the other fifteen staffers to rebut the testimony of S.L." and "failed to call Donald Batiste to rebut the testimony of R.L." Rec. Doc. 3-1, pp. 18-19.

The jurisprudence requires a habeas petitioner to "name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *King v.*

---

19 Rec. Doc. 10-10, pg. 127.

20 Rec. Doc. 10-5, pg. 162, lines 21-27.

21 Rec. Doc. 10-10, pg. 127.

*Davis, supra.* Mischler does not name any of the "other fifteen staffers" and does not describe how either Chris Bellone or Donald Batiste would have testified. Nor can he: the post-conviction relief application indicates that Bellone and Batiste are deceased.[22]

> f.    *Counsel failed to call Scott Williams, Robert Williams Jr., Edward Smith, and/or Diana Pervel. Rec. Doc. 3-1, pp. 20-22.*

Mischler submitted in connection with his application for post-conviction relief statements from Scott Williams (his nephew), Robert Williams Jr. (also his nephew), Edward Smith (his brother-in-law), and Diana Pervel (his sister).[23] According to the statements of these individuals, some of the prosecution's witnesses—who are not identified by name—stole property from Dennis Mischler.[24] The statements of these individuals do not indicate that any of them had personal knowledge that any particular theft had been committed by any particular individual.[25]

Mischler's sister Darlene Smith did in fact testify that two of her grandchildren — J.S. and W.G.—stole from Mischler.[26] Mischler himself provided similar testimony.[27] In addition, J.S. admitted to stealing from Mischler,[28] and W.G.'s sister testified to

---

22 Rec. Doc. 10-10, pp. 36-37 & nn. 23-24.

23 *See* Rec. Doc. 10-10, pp. 86-89.

24 *See* Rec. Doc. 10-10, pg. 86 (statement of Scott Williams) (referring to "several of the State's witnesses"); *id.*, pg. 87 (statement of Dianna Pervel) (referring to "those members of my sister, Darlene Smith's grandchildren, who testified as State witnesses"); *id.*, pg. 88 (statement of Edward Smith) (referring to "several of the State's witnesses"); *id.*, pg. 89 (statement of Robert Williams Jr.) (referring to "those members of my mother, Darlene Smith's grandchildren, who testified as State witnesses against my uncle").

25 *See* Rec. Doc. 10-10, pp. 86-89.

26 Rec. Doc. 10-5, pg. 116, lines 7-9. In that portion of the transcript, the reference to "Dale" is actually a reference to W.G.; "Dale" is his middle name.

27 Rec. Doc. 10-4, pg. 129, lines 18-30.

28 Rec. Doc. 10-3, pg. 170, lines 4-11.

acting in concert with W.G. to steal from Mischler.[29]

Trial counsel acted within the wide range of reasonable professional assistance in declining to call any of these individuals as witnesses. It is not clear that any of their testimony would be admissible at trial. *See* La. C.E. art. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter"). Otherwise, counsel counsel could reasonably conclude that the testimony needed for the defendant's defense was adequately presented through the witnesses that *did* testify during the defendant's case in chief.

Finally, a review of the statements shows zero support for Mischler's claim "they (412.2 witnesses) had teamed up against Mr. Mischler in an all out assault" or that they "worked together to protect each other because they knew if they did not help convict Dennis of these charges, the State would next target them." Rec. Doc. 3-1, pg. 21.

> g.    Counsel "failed to investigate or even interview Jay McKinnon." Rec. Doc. 3-1, pp. 23-24.

Mischler has not demonstrated that Jay McKinnon would testify, nor has he set out the content of McKinnon's proposed testimony.

---

29 Rec. Doc. 10-5, pg. 170, lines 10-023 (testimony of Amber Giordano).

> h.  Finally, counsel *"developed no meaningful relationship with"* the petitioner and *"[s]he was always 'too busy' to meet with him to discuss possible avenues of defense." Rec. Doc. 3-1, pg. 25.* He says that he *"notified her of several witnesses that could have been called, records that could have been obtained, and even provided [his] personal records, all that would support [his] defense." Id.*

Mischler's complaint about the quality of his relationship with his trial counsel does not form a basis for habeas relief. *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

* * *

In light of the discussion above, petitioner Mischler fails to establish that the state courts' denial of relief was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

<u>CONCLUSION AND PRAYER</u>

The petitioner fails to demonstrate that he is entitled to habeas corpus relief. The respondent respectfully prays that the Court dismiss the instant petition with prejudice and otherwise deny relief.

Respectfully Submitted,

<u>/s/ Matthew Caplan</u>
Matthew Caplan, #31650
Assistant District Attorney,
    22nd Judicial District
701 Columbia Street
Covington, Louisiana 70433
Tel: (985) 809-8398

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon petitioner

by mailing a copy, postage pre-paid, to:

      Dennis Mischler, DOC # 731698
      Elayn Hunt Correctional Center
      6925 Highway 74
      St. Gabriel, LA 70776
      *Petitioner, pro se*

This the <u>13th</u> day of <u>June</u>, 20<u>23</u>, at Covington, Louisiana.

                    <u>/s/ Matthew Caplan</u>
                    Matthew Caplan, #31650
                    Assistant District Attorney