U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED     Mar 20 2024

CAROL L. MICHEL
CLERK

AJ                                    Mail

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**DENNIS MISCHLER**                                      **CIVIL ACTION**

**VERSUS**                                              **NO. 23-990**

**TIM HOOPER, WARDEN**                                  **SECTION: "I"(5)**

## OBJECTIONS TO REPORT AND RECOMMENDATION

NOW INTO COURT, comes Dennis Mischler, *pro se*, who objects to the Magistrate's Report and Recommendation filed on February 26, 2024.

## I.    BACKGROUND FACTS

Petitioner's claims for habeas relief consisted of two main parts, each with sub-parts. Claim number one was as follows: Counsel failed to conduct a proper investigation to learn facts necessary to present a full and proper defense and present evidence favorable to the petitioner, contrary to constitutional protections set forth by Louisiana and the United States. This was broken down into sub-parts are follows:

1. Counsel failed to investigate evidence that someone else downloaded or otherwise obtained the pornography, as well as books and videos purchased at Anon Films (books & videos never showed pornography; only boys in bed with their shirts off) for which counsel never reviewed.

2. Counsel failed to investigate and find witnesses who could have presented evidence on behalf of the defense, or use the witnesses who approached her to be a witness for defendant.

3. Defense counsel failed to investigate and find evidence to contradict state witnesses at trial.

4. Counsel developed no meaningful relationship with Mischler and was therefore not able to establish sufficient trust to learn information critical to the defense. Nor did she use any of the evidential questions to Mischler that he gave her in order to contradict or elicit from

TENDERED FOR FILING

MAR 20 2024

U.S. DISTRICT COURT
Eastern District of Louisiana

witnesses.

The second claim presented to this Court was: Mr. Mischler was denied the basic principles of the law where he has been denied the right to present a defense, the right to effective assistance of counsel, and the overall due process and equal protections of law contrary to the constitutional protections of Louisiana and the United States. This claim presented a cumulative issue inquiry regarding the lack of direct evidence, contested "he said she said" testimony, an unconstitutional burden of proof, and the damning effects of other crimes evidence under 412.2 when all of the direct evidence points elsewhere.

The Magistrate reiterated the facts—approximately 10 pages worth of single spaced text—as presented by the appellate court on Mischler's direct review, then set forth a page and half worth of law emphasizing the great deference and double deference given lower courts on habeas, emphasizing that even strong cases for relief" does not mean the state court ruling is unreasonable. Then addressing his first claim of insufficient evidence, the Magistrate summarized Mischler's claim of insufficiency with a page or so followed by four pages worth of single spaced direct quotation of the First Circuit's analysis. That was followed by more case law discussion of double deference and other standards emphasizing the near impossibility for habeas relief. Starting at the bottom of page 26, the report begins its analysis of the due process claim. The Magistrate correctly itemizes the issues presented by Mischler on page 27, which is followed by single-spaced quotation from the First Circuit appellate decision. On page 29 to 32, the report goes on to pound out case law authorizing a denial of habeas review, followed by four and half pages of single-spaced block quote of the First Circuit.

The analysis of the ineffective assistance of counsel begins on page 39 and ends on page 52, with similar exacting standards and denials of habeas relief.

This objection lays out the law on standard of review, structural errors, cumulative errors,

harmless error, followed by Mischler's objections.

## II.    THE VARIOUS STANDARDS

### A.    Standard of Review

Upon timely objection of a magistrate's judge's findings and recommendations, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. 28 U.S.C.A. § 636(b)(1). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C.A. § 636(b)(1)

Section 636 (b)(1) permits the district court to adopt the credibility findings made by a magistrate judge without conducting a new hearing before making a final determination. However, the Supreme Court has suggested that a district court may not reject a magistrate judge's findings regarding the credibility of testifying witnesses without holding a new hearing where it can observe the demeanor of witnesses. U.S. v. Raddatz, 447 U.S. 667, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980).

### B.    The Harmless Error Standard

In a proceeding on collateral review, courts deem an error harmless so long as it did not have a "substantial and injurious effect or influence the jury's verdict." See, Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The Brecht standard applies "in virtually all § 2254," Fry v. Pliler, 551 U.S. 112, 117, 127 S. Ct. 2321, 2325, 168 L. Ed. 2d 16 (2007), with the possible exception to the "unusual case" where "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct . . . infect[s] the integrity of the proceeding." Brecht v. Abrahamson, 507 U.S. at 638, n. 9. When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the

petitioner must win." *O'Neal v. McAnnich*, 513 U.S. 432, 436, 115 S. Ct. 992. 130 L. Ed. 2d 947 (1995). The Court has explained that "[b]y 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." 513 U.S. at 432.

In *Brown v. Allen*, the Supreme Court held that a state-court judgment is not *res judicata* in federal habeas proceedings with respect to a petitioner's federal constitutional claims. 344 U.S. 443, 458 (1953).

## C.    The Structural Error Standard

Some constitutional violations "by their very nature cast so much doubt on the fairness of the trial process that, as a matter or law, they can never be considered harmless." *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988). These are referred to as constituting structural errors. Cases involving structural error, however, are "rare." *Washington v. Recuenco*, 548 U.S. 212, 218-219, 126 S. Ct. 2546, 2551 (2006). "Typically, an error is designated as structural, therefore requir[ing] automatic reversal, only when the error necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Rivera v. Illinois*, 129 S. Ct. 1446, 1449, 173 L. Ed. 2d 320 (2009); *see also, Neder v. U.S.*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35, 99-1 U.S. Tax Cas. (CCH) P 50586, 83 A.F.T. R. 2d 99-2668 (1999) (a structural error involves a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself . . . Such errors infect the entire trial process, and necessarily render a trial fundamentally unfair. Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamental fair")

D.     **The Cumulative Error Standard**

In *Chambers*, 410 U.S. at 284, 93 S. Ct. 1038, the single due process violation was based on two separate state evidentiary errors. It was the interaction between these two evidentiary trial errors that "frustrat[ed] [the petitioner's] efforts to develop an exculpatory defense," which resulted in the violation of petitioner's right to due process. *Chambers*, at 292 n.3, 93 S. Ct. 1038. Cumulative errors also exist where the prejudice results from multiple constitutional errors. A cumulative error analysis of this type "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial such that collectively they can no longer be determined harmless. *U.S. v. Toles*, 297 F. 3d 959, 972 (10th Cir. 2002). For example here, the collective testimony of the DA's witnesses who had nothing to do with the charges but nonetheless had a major effect on the jury, especially since they were the first witnesses to be questioned.

Unlike the *Chambers* variety of cumulative prejudice, application of cumulative error review applies to legal diverse claims such as prosecutorial misconduct and improper limit on defense cross-examination. *Id*. at 972. The Fifth Circuit has developed a four-prong test that restricts what claims a federal court can cumulate in federal habeas proceedings. First, errors alleged in a cumulative error claim must refer only to errors committed in the state trial court that have not been cured by that court. Second, the errors must not be procedurally barred. Third, the errors must be "constitutional"—that is they must have "so infused the trial with unfairness as to deny due process of law. And fourth, the errors must make it more likely than not that the verdict is "suspect." *Derden v. McNeel*, 978 F. 2d 1453, 1458 (5th Cir. 1992) (en banc)

III.    **MISCHLER'S OBJECTIONS**

The report signs off on the State's continued attempts to manipulate the facts specific to this case and mislead this Honorable Court. The State presented evidence and witnesses who were irrelevant to the charges, the state purposely presented information and testimony that were not

based on truths, but deliberate deception. As the Court noted, Mischler has repeatedly urged the unconstitutionality of the 412.2 evidence because it convicted Mischler by other crimes, acts or wrongs that were not the basis of the charged offenses. Said another way, Mischler was convicted using no direct evidence, and all circumstantial evidence that was formed by passion and bias. The only and single instance of direct testimony came in the form of, paraphrasing, "I don't remember the details."

Proxy witnesses were used as an intentional deception of the jury. Through the biased and deceitful manipulation of the DA's witnesses testimony, the Prosecutor was able to mislead and prejudice the jury against the Petitioner.

The unconstitutionality of prior act evidence leads the jury to convict out of passion or bias or because they believe the defendant is a bad person deserving punishment.  As to to the 412.2 evidence, this is a very real risk associated with this sort of evidence. And while it may not appear unfair to the legislature creating the law or the juries applying it, that hardly means that the rule itself is (1) not unconstitutional and (2) that there are not real prejudicial, unconstitutional dangers associated with the law. Legislatures have passed many acts that have been struck down as unconstitutional. Moreover, many judges and juries have applied plenty laws once believed to be benign. Additionally, juries and judges have unconstitutionally applied laws. Mischler has asserted that the unconstitutionality of the laws on their face and as applied to him.

And in contrast, counsel never brought out any of Mischler's awards and decorated background to show that he lead an exemplary life. The jury was inflamed and impassioned against Mr. Mischler from the get-go because of this "relevant" other evidence that had nothing to do with the charges.

Is it not easy for this Court to think of a scenario where the jury uses other acts or wrongs or lustful disposition evidence to convict a defendant because it is disgusted by the defendant's past

rather than convinced that he did the crime charged?

Can the Court not conjure up a scenario where a jury is unsure of guilt because there is no direct evidence, but decides to convict anyway because it believes the other "crimes" evidence or lustful disposition evidence shows the defendant is an evil doer who deserves to be locked up? Because this occurred here. And the occurrence is unconstitutional.

Why would a DA need propensity or lustful disposition evidence from uncharged cases or a case that exonerated a defendant? Why not simply submit evidence to the jury for the crime involved. It is not because the DA has difficulties winning cases. Absolutely not. Most DA's boast a 95% or better conviction rates. And these rates are certainly not because these government lawyers are the cream of the crop lawyers who are simply better than the lot of defense lawyers out there. When someone's life and liberty are on balance, there is no need to give another edge to the prosecution who simply has no direct evidence to support their claim. Allowing the prosecution to use other non-charged evidence is unconstitutional, and simply stacks the already winning side, allowing a 99% conviction rate rather than 95% simply because the seemingly allows the prosecutor to inflame the juror. Other crimes, acts, or wrongs, to show lustful disposition is unconstitutional on its face, and as applied.

In the case of the witnesses for the State (SL, RL, and GW), the Prosecuting Attorney, in effect put the Petitioner through a second trial for each of those alleged incidents that he was found innocent. In their cross examining of these three witnesses, the Prosecuting Attorneys purposefully misled the jury by allowing those witnesses to testify as to his guilt of those allegations, when in fact he was found innocent in all three cases, and found innocent **without** any reasonable doubt. The DA's questions and innuendos of these three witnesses misled the jury into believing that the Courts responsible for the rendering of a verdict of innocent regarding those charges were wrong in their decisions even though the DA never read the transcripts of those prior cases. To add salt to the

wound, counsel for defendant did not use these exonerations in her cross-examinations of these witnesses either. For each of those cases (SL, RL, & GW) Mr. Mischler was found innocent based on facts that this DA had no knowledge, yet they presented to the jury these witnesses as victims for those charges that he was found innocent. None of the statements of the DA's witness were based on truths, but rather deliberate deception presented by the Prosecuting Attorneys.

The State's continuous use of their deceptive means created an illusion of credibility, when in fact their case was based upon the intentional misleading of jurors – through lies and innuendos. By their blatant misleading of the jury at his trial, the State has denied Mr. Mischler the basic principles of the law where he has been denied due process, the right to present a defense, the right to effective assistance of counsel, the overall due process and equal protection of the law contrary to constitutional protection of Louisiana and the United States.

## A.    Denial of Due Process

Mischler apologizes for any repetition, and asserts that the constitutional violations (including the due process and effective counsel Sixth Amendment requirements) are so mixed with the facts, that there is no safety but to repeat arguments.

The Court reasoned that the Defendant's name, physical address, and email address were found in the Toronto Company and Azov Films records, showing multiple purchases of child erotica and child pornography billed and shipped to Petitioner. The State never showed that there was actual pornography in the books or videos from Azov or Toronto Company. The DA never showed any pornography in or on these purchased items—only that they were purchased from a company who sold pornography. Counsel never objected, disputed, or used it to cross examine witnesses. A postal inspector confirmed that the defendant was the actual person who was accessing the company's website. How could the postal inspector know the Petitioner was actually accessing the company's website? Instead, the State used this red herring evidence as a foundation without any showing that

pornography was found from these companies that were in Mischler's possession.

The evidence submitted to the jury, and to this Court, showed that Mischler's checking account had been hacked and used to purchase items without his consent several times between September 2007 and September 2008, including the exact days in 2008 that the alleged pornography was purchased at both his New Orleans and Covington addresses. The evidence also showed that he contacted his bank to report this theft. He also showed that he did not know the content of the purchases because the bank did not provide that information. He specifically stated that a member of his family (who was a State witness) and his friend were at each address at the time the pornography was purchased and delivered to his homes. The State had the time and responsibility to investigate this information with the bank to verify that this was the case. This would have raised a doubt as to Mischler's guilt and the possibility of someone else making these purchases. So how is the postal inspector so sure, and this Court agree, about Petitioner being the purchaser and not being a reasonable doubt? The judge (without the jury present) showed his bias by telling Mischler that this pornography was indeed minimal.

The evidence showed that WG and his friend visited Mischler at his New Orleans address during the Mardi Gras (February 2008). They then visited Mischler at his New Orleans address from February through May 2008, yet even slept at Mischler's home. WG and his friend had a key to his New Orleans apartment, access to Mischler's computer there, access to his chest of drawers with his bank books and extra credit cards. They were allowed to stop at Mischler's house while he was at work. This was during the time the items were illegally purchased and charged to Mischler's account (which was reported to bank and law enforcement). WG and his friend had access to Mischler's mail box and could have easily retrieved those packages from Azov or Toronto with Mischler's knowledge. In May, WG and his friend helped Mischler pack his belongings while he was at work, and helped him unpack when he arrived at his house in Covington. Because Mischler was very ill, he

needed assistance taking care of his house and property. WG offered to stay with Mischler and help care for him because his friend also lived in Covington, who would also visit and help care for Mischler and his property. He also stayed over night every once in a while. WG came in the middle of July and stayed to the middle of September. This was the same time the items from Azov films were purchased and delivered to Mischler's home. Again, WG and his friends has total access to Mischler's house, computer, checkbook, credit cards, and mailbox.

The Court reasoned that law enforcement officers recovered from Mischler's bedroom approximately 5,000 images and 26 videos found on two thumb drives located in a nightstand next to his bed showing that files had been accessed and downloaded as recently as three to fifteen days before the search was conducted. However, the computer analyst who was part of the search team could not find any trace of child pornography on the only computer in Mischler's bedroom from the second week in May until May 29, the day of the search of Mischler's home. The State's own computer forensics analyst opted not to take the computer for a thorough analysis. Credibility excuses to the side, how can this Court disregard this fatal error? He stated since he cannot find any evidence of pornography on the computer there was no need for further analysis. Thus, the thumb drives were never successfully linked to Mischler, and a conviction by a jury based on that failure to link Mr. Mischler is a due process violation.

The same computer was later brought to a professional computer analyst who verified that there were no pornographic files, hidden or otherwise, found on Mischler's computer. Then where did the contraband files get transferred to the hard drives that they said were recently accessed? And how could the jury conclude beyond a reasonable doubt they were obtained by Mischler, which this Court is attempting to rubber stamp?

Mischler would have had to download the pornography on the computer that the State's computer analyst said did not contain pornography in the cache, cookies, or other internal computer

data of Mischler's only computer. Second, Mischler purchased that computer almost four weeks before the search of his home (which subsumed the times the State contended Mischler accessed the thumb drives). And let's be clear, there is no cat and mouse games with the State's powerful investigative arm. The State knows which computer accessed the thumb drives, and it knows that it was not Mischler's computer. How this completely un-fillable gap passed reasonable doubt as to Mischler, and signed off by this Court, is clearly erroneous and unconstitutional.

At the time of the search of his home, Mr. Mischler was told that approximately four books and ten videos were purchased by him from the Toronto and Azov Companies. However, the search of his home was only able to find two books and one video identified as part of the purchase items. He explained to the detectives that because of his serious and life threatening health issues from early 2008 until 2014, many family members and their friends helped care for him and had total access to his home, his alarm system, house access codes, extra house keys, computers, TV's, pool, etc. He stated that they were all under investigation for the May 3, 2014 robbery, which was reported to the police. Anyone of these people could have easily purchased those books and videos and could easily have taken those thumb drives to their home to download the pornography using thumb drives he had available at his home for anyone to use. Mischler even stated that he had family members who would testify to this. He stated that he thought the reason why some of the pornographic purchases could not be found at his home as well as the pornographic stick drives found at his home was because someone was taking these books and videos, as well as the thumb drives to their home and bringing them back and forth to his house when they weren't being used and for the fact that it was easy to get in and out his house without being detected.

Also Mischler ascertains that, because WG was incarcerated during the month of May, he did not find out until after May 15th, that Mischler gave the detective who was in charge of the May 3rd robbery at his home, all the people who had access to his house at the time of the robbery and where

they lived, providing full permission to prosecute anyone responsible for the robbery, theft, and fraudulent activity. WG could have easily transported his own pornography to and from Mischler's house. And since his friend also knew Mischler's security access code and where the extra keys were stored, he could have easily brought the thumb drives and videos found in Mischler's home. The State chose not to investigate any of these facts or witnesses who would collaborate Mischler's statement. Nor did Mischler's counsel address it.

The State claimed that the pornography was only downloaded when Mischler was at his home and stopped whenever he was in the hospital in order to prove that it was Mischler that was responsible for downloading the pornographic files. The State waited to bring this out. If they would have interrogated family members who lived at Mischler's home, they would have learned that no outside family members and/or their friends visited Mischler's home while he was in the hospital. There was no need, because they would have had no one there who they had to care for. They were at Mischler's home only during the times that he was there. However, every person who assisted Mischler and had access to his home and property, knew when his sister and brother in law was at work. Since they and Mischler were the only residents who lived there year round, anyone of those individuals could have gotten into his home, took anything they wanted, and/or used any of his televisions, computers, pool, food, or any of his things that they wished, especially since between 2008 and 2014 Mischler was in the hospital on numerous occasions, spending between two days to two weeks each time he was admitted.

In the case of JS, the State charged Mischler with two counts of oral sexual battery and one count of molestation of a juvenile. JS testified that after Hurricane Katrina, while living in a FEMA trailer in St. Tammany Parish, Mischler would give him and other boys gifts and take them to movies any time they wanted. During one of those visits to the defendant's trailer, JS testified that Mischler performed oral pleasure on a sensitive area while JS's friend was at a store and only stopped when

the friend returned.

   This did not happen for several reasons: First, Mischler never gave JS and/or other boys gifts or took them to the movies, while defendant was living in his FEMA trailer, because except for the time he and his friend spent the night at his trailer, no other boys ever came to his FEMA trailer. Mischler stayed in the FEMA trailer with his sister, from December 2005 to the Fall of 2006. During that time, there were no movie theaters opened anywhere, and Mischler, Darlene Smith, Eddie Smith, and Scott Williams had no money to buy anyone gifts. They were just trying to survive at that time.

   Second, Josh, only visited Mischler at his trailer three times; once when he stole money from Mischler and his grandmother (Darlene Smith), once when he came with his mom, and the night when he came with his friend and the alleged sexual incident was to have taken place. This was a lie and fabrication of JS, which could also have been confirmed by asking Darlene Smith, who was living in the trailer with Mischler.

   Third, and most critical, Darlene Smith was an eye witness to the times, specifically that night, the night which JS visited the FEMA trailer. Since JS stole money from Mischler, she never left JS out of her sight the whole time he was in the trailer; even to the point of staying awake the whole night JS and his friend were there. Because her bedroom had direct line of vision into Mischler's bedroom, she could and would have confirmed that Mischler went to sleep early and that at no time did he perform any sexual acts on JS. Strangely, but no doubt intentionally, the State did not question the one witness present at the time of the alleged assault as to the events of the night in question. This is the vital part of and testimony that would have cleared Mischler of the charge. Counsel did not address this crucial evidence.

   Fourth, what is even more incredulous is that JS could testify to all the specific details of that night leading up to the alleged incident, but did not remember or know the specifics of that event.

How can a juror believe an assault occurred when the alleged victim did not remember the specifics of the alleged event.

Additionally, JS described a later incident, still within a year of Katrina, where Mischler took him to a hotel in Covington and again performed oral sex on him. On that occasion, JS testified that the defendant also attempted to anally penetrate him, but stopped when JS told him to stop. This, too, could not have happened for several reasons.

First, from September, 2005 and throughout the entire year of 2006, Mischler and his sister Darlene Smith left the trailer at 4:30 a.m. to cross the Causeway Bridge in order to go to work in New Orleans and Metairie respectively. They did not get back to the FEMA trailer until 8:00 pm or 9:00 pm that night. This was due to the twin span being destroyed during Katrina and all displaced victims of Katrina and all displaced victims of Katrina had to use the Causeway Bridge to get back to their temporary homes. Because of the large number of cars crossing in the morning and at night, it took hours to get home. Mischler and Smith did this Monday through Friday every week for almost an entire year. Darlene and Eddie Smith, as well as Scott Williams would have confirmed this fact.

Second, every Saturday and Sunday, Mischler, along with Darlene, Eddie, and Scott would travel to different parts of St. Tammany, other parishes in the State, and even to parts of Northern Mississippi, visit churches as well as the the Red Cross to purchase food, clothing, fuel for our generator, ice, and other bare necessities, just to survive post Katrina atrocities. Darlene, Eddie, and Scott would have confirmed that Mischler spent each weekend with them, and didn't have the funds or time to take JS to a hotel.

Third, during the days/time Mischler was to have taken JS to a hotel in Covington, no hotels were opened at that time anywhere in Covington. All of these facts regarding JS's hotel allegations could have easily been proven to be false if the State would have investigated as to who could have

been present at the FEMA trailer and simply questioned the people who lived there and was with Mischler throughout all of Post Katrina until the end of 2006. Counsel did not address this.

The Prosecuting Attorneys used an innocent game called the "the Drinking Game" and JS and his siblings to create an illusion of debauchery and immorality when they would visit him at his New Orleans home on Vanderkloot Avenue. They created this scenario of a harmless game that turned into a homosexual sex fest, when in fact the statements of those witnesses were contradicted by each other. (i.e., JS stated that it was only him, WG, and Richard Maguire at the house when they played the drinking game, but he wasn't sure what they drank.)

TP stated that it was JS, WG, and TP who were there, that they drank Crown Royal. TP also stated that later that evening, with no one else present, Mischler performed oral sex on him followed by anal sex. He stated that that was the first time he had sex with a male. WG stated that it was Zinfandel wine that they drank. That he was a witness to TP and Mischler having sex. That he and TP had been having homosexual sex for as long as he could remember. Counsel did not address this.

If the DA would have thoroughly investigated these events, they would have learned from reliable witnesses that because of the death of his brother from a drunk driver, Mischler banned all alcoholic beverages, as well as any type of social drugs on or in any property he owned. The "drinking game" was done with CranApple juice. It was only after Katrina that WG and JS informed Mischler that they used his home to buy drugs from dealers in New Orleans and for WG and TP to have sex, since they could no longer use their home in Slidell without being caught, especially when he was working.

If the DA would have further investigated they would have discovered that WG only spent one day with Mischler when he was nine years old (1999). That was when Mischler took him to the TV studio at Mischler's work, to the French Quarter for lunch, and then drove him back home to Slidell. After that time WG, JS, and their sister Brittany Giordano went to Oklahoma to live with

their father. Mischler didn't see them again until 2002 when his niece and her five children moved in with him. They stayed with Mischler until June of 2004. Mischler's niece and daughter Amber Giordano would have testified that nothing of a sexual nature ever took place at that time. The only immoral act was when Amber and WG forged Mischler's signature on one of his checks and cashed that check in the amount of $1,300.

## B.    Ineffective Assistance of Counsel

Mischler adopts and reiterates the paragraphs above that address failures of counsel, as well as the case law provided in his memorandum submitted with his habeas corpus application. The *Strickland* Court (presumed under Cronic) tells us that a person who happens to be a lawyer, present at trial, is not enough to satisfy the Sixth Amendment, an accused is entitled to an attorney who plays the role necessary to insure that the trial is fair, which evidence is subjected to adversary testing.

A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment this Court must determine whether, in light of all the circumstances, the identified acts or omissions were outside  the wide range of professional competent assistance . . . quoting *Strickland*, moreover, actual or constructive denial of the assistance of counsel is legality presumed to result in prejudice.

Petitioner's sister, Darlene Smith, was with him every time he met with counsel including the five day jury trial. Ms. Smith will attest via an affidavit that the Petitioner gave counsel very important and pertinent information that would have negated the testimony of State witnesses, as well as State's evidence related to the charges made against him. Counsel, however, chose not to use any of that information.

Ms. Smith has attested that every day of his trial, Mischler tried to meet with counsel to review the evidence and/or the State's witnesses testimony, but was told by Counsel that she didn't

have the time because she had to go to another courtroom, or that she had papers she had to file, or she had to meet with other clients. This was during all five days of Mischler's trial.

### 1.    Failure to Investigate – Pornography Charge

Concerning the pornographic books and videos allegedly purchased, Counsel did not do a pretrial investigation to obtain bank records that would have shown that the timeline of the purchase and delivery of the child pornography sent to the address in New Orleans and address in Covington coincided with the time Mischler reported fraudulent use of his checking account, as well as the dates that WG and his friend(s) were at his home. In her cross examination of WG, she never questioned WG about that, nor brought it out in her closing arguments. She also never acquired the school records of GW from Slidell High that showed that he was expelled because of propositioning an underage male freshman.

Even though only two of four books and one of nine videos purchased from Azov films were found in Mischler's home, neither of those items were part of the charges made against him. Counsel failed to investigate and request a review of those books and videos found in his home to ascertain if in fact they contained child pornography. Counsel failed to request a review of the two videos presented by the DA in the form of still pictures pulled from those videos and was not purchased from Azov, but found in Mischler's home actually contained child pornography. Counsel failed even to attempt to locate the books and videos not found in Mischler's possession, starting with the two persons who were at Mischler's home each time the purchases and delivery of those items took place.

Concerning the two thumb drives containing child pornography found in Mischler's bedroom, this was an extremely important factor to this case as it constituted 45 years of the 60 year sentence imposed on Mischler. To that end, the testimony of a computer forensic analyst was paramount. Here, counsel was aware that the professional computer analyst at the time of the search of

Mischler's home could not find any trace of child pornography on his computer. She was also aware that this same analyst did not think it necessary to take Mischler's computer with him for further analysis.

Counsel failed to have Mischler's computer analyzed by an outside analyst of his own to confirm that Mischler's computer did not contain any child pornography. By having a confirmation report by an outside professional source, counsel would have been able to prove that Mischler could not have downloaded the pornography on the two thumb drives, since that was the only computer in Mischler's possession from the second week of May and up to May 29th, the time of the search of Mischler's home. The very simply fact to be concluded here is that you cannot download anything on a thumb drive without a computer. Counsel insisted that it wasn't necessary since the State's professional analyst did not find anything, which is absurd and ineffective especially in light of the quantity of evidence that the State put on that actually had nothing to do with the indictment. In other words, the State added people and quantity rather than quality; Defendant's counsel should have done the same thing by adding a barrage of its own witnesses and reports.

Mischler's family eventually had his computer analyzed by a computer forensics expert who confirmed that his computer did not contain any child pornography.  Counsel's acquisition of this report for displaying to the jury would have assisted. And the failure to do so was ineffective under the constitution. Because in these types of cases, you must do everything you can to disprove a negative, even if a State's expert confirms your position. It's unfortunate, but necessary and true when dealing with the good ole' DA who is simply fighting for "justice" while an "evil" defendant sits in a jury's cross-hairs.

### 2.        Oral Sexual Battery & Molestation Charges - Ineffectiveness

Concerning the charge of oral sexual battery performed by JS at the FEMA trailer, counsel failed to cross examine Darlene Smith, the only eye witness  at the time of the alleged event

(excluding obviously, the alleged victim and Mischler himself). She would have testified to the fact that, because JS had stolen from Mischler in the past, she stayed up the whole night to make sure he didn't do it again. She would have also testified that because of the size and configuration of the FEMA trailer, she had a clear visual of Mischler's trailer bedroom. She would have testified that nothing occurred that night. Given the fact that JS stole from Mischler, that he was a known liar, a drug addict, and a felon this testimonial information by an eye witness would have destroyed JS's testimony and the DA's charge of oral sexual battery taken place in the FEMA trailer. The magistrate is wrong in finding that Mischler was able to get this testimony in by other means. Mischler, like the DA who introduced cumulative testimony, deserves to introduce as many denials and contradictory evidence as possible.

Additionally, counsel failed to use the testimonies of Darlene Smith, Eddie Smith, and Scott Williams, who were willing to testify that Mischler could not have taken JS to a hotel at the time he claimed that the alleged incident took place, because between the Fall of 2005 through the Fall of 2006, due to Post-Katrina conditions, Mischler was with them every day of the week and on weekends. Darlene, Eddie and Scott would have testified that Mischler left at 4:30 am to go across the Causeway to work, and didn't return home until approximately 8:30 pm Monday through Friday. Darlene, Eddie and Scott would have testified that on weekends in this time period, Mischler was with them as they traveled throughout St. Tammany and the surrounding parishes, as well as Northern Mississippi, churches, Red Cross, and other agencies to find and purchase food, clothing, fuel, ice, and other necessities needed to just survive. Counsel chose not only to call these witnesses, but chose not to present this evidence at Mischler's trial.

In pretrial investigation, Counsel could have easily destroyed JS's testimony of the alleged incident that took place in a hotel. She merely had to visit the hotel(s) on Highway 190 in Covington to ascertain as to whether or not they were operating at the time the incident was to have taken place,

and more importantly, did they have a record of Mischler being there. Counsel chose not to investigate a sure fire way to disprove the bogus allegations, which would have changed the jury's verdict.

Concerning the testimony of SL, Counsel was given the name of Chris Bellone who was at the hearing in Mississippi in 1980 and would have testified as to Mischler's innocence, thus destroying the credibility of that State witness. Not only did Counsel not use Bellone as a critical witness for the defense, she never even attempted to call him as part of a pretrial investigation, nor did she attempt to get Court records of the 1980 hearing in Hancock County, Mississippi. Bellone died in 2018. The magistrate is wrong in finding that Mischler was able to get this contradictory testimony in by other means. Mischler, like the DA who introduced cumulative testimony, deserves to introduce as many denials and contradictory evidence as possible, especially in these types of cases, where one must do everything he/she can to disprove a negative.

Concerning the testimony of RL, Counsel was given the name of Donaldo Batiste to be a witness for the defense. Batiste was the principal of the school where Mischler was RL's teacher and also attended  the 1989 trial where Mischler was found innocent of the charges brought against him. Batiste would have testified as to the proceedings and outcome of that trial. This would have totally discredited RL's testimony. Again counsel failed to contact Batiste and subpoena the New Orleans court records of the trial in a pretrial investigation. Batiste died in 2017. Mischler, like the DA who introduced cumulative testimony unrelated to the charges, deserves to introduce as many denials and contradictory evidence as possible, especially in these types of cases, where one must do everything he/she can to disprove a negative.

Concerning the testimony of GW, counsel failed to subpoena Arkansas Court records to present as evidence of Mischler's innocence. She also failed to call Scott Williams or Eddie Smith who, along with the testimony of Darlene Smith and Amber Giordano would have testified that

Mischler was never alone with Gerard Williams. What was even more critical was counsel was given information by Mischler that in 2005, TP, WG, AE, and JS were questioned by Laura Evans (the mother and adopted mother of those four men) in regards to Mischler ever molesting them. They all denied any inappropriate sexual behavior by Mischler. Counsel never investigated or tried to contact Mrs. Evans in order to ascertain the legitimacy of this evidence, nor upon cross examination of these State witnesses, did counsel even mention their denial. This information alone would have totally discredited all those State witnesses. Laura Evans has since died.

Concerning "the drinking game" in which JS and his siblings created an illusion of debauchery and immorality when they would visit him at his New Orleans home on Vanderkloot Avenue. Counsel, in her cross examination and/or her closing remarks failed to emphasize that those witnesses contradicted each other. (i.e., JS stated that it was only him, WG, and RM at the house when they played the drinking game, but he wasn't sure what they drank.)

TP stated that it was JS, WG, and TP who were there, that they drank Crown Royal. TP also stated that later that evening, with no one else present, Mischler performed oral sex on him followed by anal sex. He stated that that was the first time he had sex with a male.

WG stated that it was Zinfandel Wine that they drank. That he was a witness to TP and Mischler having sex. That he and TP had been having homosexual sex for as long as he could remember. If counsel would have thoroughly investigated these events, she would have learned from reliable witnesses that, because of the death of his brother from a drunk driver, Mischler banned all alcoholic beverages, as well as any type of social drugs on or in any property that he owned. The "Drinking Game" was done with CranApple juice. It was only after Katrina that WG and JS informed Mischler that they used his home to buy drugs from dealers in New Orleans and for WG and TP to have sex, since they could no longer use their home in Slidell without being caught. They also did this, and bought and took drugs while Mischler was working.

If counsel would have investigated prior to Mischler's trial, she would have discovered that WG only spent one day with Mischler when he was nine years old (1999). That was when Mischler took him to the TV studio at Mischler's work, to the French Quarter for lunch, and then drove him back home to Slidell. After that time, WG, JS, and their sister, Brittany Giordano went to Oklahoma to live with their father. Mischler didn't see them again until 2002 when his niece and her five children moved in with him. They stayed with Mischler until June of 2004. Mischler's niece and daughter Amber Giordano would have testified that nothing of a sexual nature ever took place at that time. The only immoral act was when Amber and WG forged Mischler's signature on one of his checks and cashed that check in the amount of $1,300.

Further investigation and subpoena of St. Tammany School Board records by counsel would have revealed that WG was expelled for sexually propositioning a minor – a male freshman. Further investigation of Laplace Sheriff's record would have revealed that Michael Mischler was charged with rape, but the charge was dropped because the victim was found dead. All these damaging evidences would have totally discredited all the State's witnesses, but counsel failed to investigate, subpoena, and/or use in her cross examination or closing remarks.

**WHEREFORE**, Dennis Mischler, prays that this Objection to the Magistrate's Report and Recommendation be deemed good and sufficient, and that after due consideration, this Court conduct a *de novo* review of Petitioner's Habeas Corpus, conduct an evidentiary hearing, and rule in Petitioner's favor. Petitioner prays for any and all other general and equitable relief under the law.

Respectfully submitted:

*Dennis Mischler*
_____
DENNIS MISCHLER #731698
ELAYN HUNT CORR. CENTER
6925 HIGHWAY 74
SAINT GABRIEL, LA 70776

## **CERTIFICATE OF SERVICE**

I hereby certify that Elayn Hunt Correctional Center does not grant inmates access to CM/ECF for electronically filing documents. I further certify that I filed the foregoing by first-class mail by placing same in the U.S. Mail Box directed to the Clerk of Court and the following participants:

United States District Clerk's Office
Hale Boggs Federal Bldg.
500 Poydras Street, Rm. C151
New Orleans, LA 70130

Michael B. North, Chief Magis. Judge
Hale Boggs Federal Building
500 Poydras Street, Rm.B419 Div. "I" (5)
New Orleans, LA 70130

Matthew B. Caplan
Asst. District Attorney
701 N Columbia Street
Covington, LA 70433-2760

**Dated: March** _18_ **, 2024**

_Dennis Mischler_
DENNIS MISCHLER



US POSTAGE ᴾᴵᵀⁿᵉʸ ᴮᴼᵂᴱˢ

$ 004.27°

ZIP 70776
02 4W
0000387932 MAR 18 2024

Dennis Mischler #731698
Elayn Hunt Corr. Center
6925 Highway 74
Saint Gabriel, LA 70776

United States District Clerk's Office
Hale Boggs Federal Building
500 Poydras Street, Rm. C151
New Orleans, LA 70130

PRISON MAIL
NOT CENSORED
FOR CONTENTS. NOT RESPONSIBLE
ELAYN HUNT CORRECTIONAL CENTER